IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| WENDY C.H. WELLIN, *on behalf of the Estate of Keith S. Wellin as its duly appointed Special Administrator*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 2:16-cv-00414-DCN |
| THOMAS M. FARACE, ESQ., *individually and as agent for Nixon Peabody, LLP*, and NIXON PEABODY, LLP, | ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) | |

This matter is before the court on defendants Thomas M. Farace, individually and as an agent for Nixon Peabody, LLP, ("Farace") and Nixon Peabody, LLP's ("Nixon Peabody," together with Farace, "defendants") motion for summary judgment, ECF No. 144 (as supplemented by ECF No. 238). For the reasons set forth below, the court denies defendants' motion for summary judgment.

## I.  BACKGROUND

Because the parties are well-acquainted with this interminable litigation, the court will provide only a brief recitation of the underlying facts and focus on the matters at hand. This case involves claims that defendants committed legal malpractice while providing estate planning services to Keith S. Wellin ("Keith"). In approximately 2001, defendants began representing Keith with respect to his estate planning, both individually and as Trustee of the Keith S. Wellin Florida Revocable Living Trust dated December 11, 2001 (the "Revocable Trust"), which defendants drafted on Keith's behalf. In 2003, Keith entered into a series of transactions to reduce the amount of estate taxes due upon

1

his death (the "2003 Transaction"). Acting on advice from Farace, Keith and his children, Peter J. Wellin ("Peter"), Cynthia W. Plum ("Ceth"), and Marjorie W. King ("Marjorie" or "Mari") (collectively, the "Wellin Children"), established Friendship Partners, L.P. ("Friendship Partners"). This limited partnership was established using the "Strangi" strategy and was funded with shares of Keith's Berkshire Hathaway Class A stock (the "Berkshire Stock"), valued at approximately $90 million. ECF No. 62-4 at 23–30; ECF No. 62-7 at 26. At the time Friendship Partners was formed, Keith owned 98.9% of the partnership, while a separate limited liability company controlled by the Wellin Children owned the remaining 1.1% of the partnership. Wellin v. Wellin et. al., No. 2:13-cv-01831-DCN (hereinafter, "Wellin v. Wellin") (ECF No. 301-1 at 22).

On November 7, 2006, Farace sent Keith a letter enclosing a compilation of Keith's net worth and taxable estate. In the letter, Farace stated that most practitioners were advising clients to no longer rely on the "Strangi" strategy for potential estate tax savings. Farace accordingly recommended alternative tax-saving techniques, including a sale of Keith's limited partnership units to an intentionally defective grantor trust, which was an option that Farace had previously presented to Keith in 2001. Keith did not immediately take any action, and the existing structure of Friendship Partners remained in place.

Keith was diagnosed with cancer in 2008. Around that time, Farace again recommended that Keith consider selling his limited partnership units to an intentionally defective grantor trust. On November 2, 2009, pursuant to the advice and direction of defendants, Keith established the Wellin Family 2009 Irrevocable Trust (the "Irrevocable Trust"), which named the Wellin Children as trustees. On November 30, 2009, Keith, via

the Revocable Trust, sold his partnership units in Friendship Partners to the Irrevocable

Trust (the "2009 Transaction"). As a result of the 2009 Transaction, Keith was issued a

promissory note with a face value of $49,800,000, which was approximately 55% of the

value of the underlying Berkshire Stock. Farace predicted a future estate tax savings of

between $14 million and $18 million based on the 2009 Transaction.

After receiving a letter from Farace on January 6, 2010, Keith expressed

confusion regarding the impact of the 2009 Transaction on Keith's estate tax liability. In

response, Farace sent follow-up letters in January 2010, November 2011, and November

2012 further summarizing the 2009 Transaction. At no point did Keith and Farace

discuss the impact of the 2009 Transaction if the Berkshire Stock were to be sold prior to

Keith's death. Wellin v. Wellin (ECF No. 599-5 at 5).

In June 2013, Keith terminated his attorney-client relationship with Farace and

hired new counsel. On July 3, 2013, Keith sued his three children seeking to set aside the

2009 Transaction, alleging that he "did not know or understand that he had lost all control

over and access to his partnership interests" in the 2009 Transaction. Wellin v. Wellin

(ECF No. 301). The complaint in that case further alleged that Keith "unknowingly sold

his partnership interest for less than market rate while also retaining the income tax

liability should any of the [Berkshire Stock] or the partnership interests be sold." Id.

Wellin v. Wellin was later dismissed upon settlement of the case. Id. (ECF No. 978).

Keith died on September 14, 2014. On February 10, 2016, plaintiff Wendy C.H.

Wellin ("Wendy"), on behalf of the Estate of Keith S. Wellin (the "Estate") as its duly

appointed Special Administrator, filed the instant action against defendants alleging

causes of action for negligence, breach of fiduciary duty, breach of contract, and aiding

and abetting breach of fiduciary duty.  ECF No. 1, Compl.  In the amended complaint,

now the operative complaint, the Estate further alleges that defendants designed and

implemented estate planning structures in 2003 and 2009 that "failed to adequately

protect the interests of [Keith]."  E.g., ECF No. 9, Amend. Compl. ¶ 51.  The Estate

further alleges that defendants failed to "inform or advise [Keith] as to the inherent risks

and consequences of participating in [the] transaction[s]."  See, e.g., id. ¶ 51.  Finally, the

Estate alleges that defendants aided and abetted Peter and Ceth in breaching their

fiduciary duties owed to Keith in connection with the 2009 Transaction.  Id. ¶ 69.

On September 8, 2017, defendants filed their first motion for summary judgment.

ECF No. 62.  On October 15, 2018, defendants filed their second motion for summary

judgment.  ECF No. 144.  On November 6, 2019, the court granted summary judgment in

favor of defendants, finding that the Estate's claims were barred by the statute of

limitations.  ECF No. 208.  On January 6, 2020, the court denied the Estate's motion to

alter or amend judgment.  ECF No. 214.  The Estate appealed the grant of defendants'

motion for summary judgment and denial of the motion to alter or amend to the United

States Court of Appeals for the Fourth Circuit, ECF No. 216, and on November 21, 2021,

the Fourth Circuit vacated the court's judgment and remanded the case for further

proceedings, ECF No. 219 (reproducing the Fourth Circuit opinion).

Following the Fourth Circuit's decision, defendants filed a supplemental

memorandum in support of their motions for summary judgment on April 22, 2022.  ECF

No. 238.  The supplemental memorandum addressed new grounds for dismissal based on

the Fourth Circuit's ruling and on new claims that the Estate supposedly raised during the

appeal proceedings.  The Estate responded to the motion for summary judgment on May

23, 2022, ECF No. 239, and defendants replied on June 7, 2022, ECF No. 240. On October 13, 2022, the court requested supplemental briefing from the parties on an evidentiary issue related to Keith's testimony in <u>Wellin v. Wellin</u>. Both the Estate and defendants filed timely supplemental briefs on November 1, 2022. ECF Nos. 257, 258. As such, the motion has been fully briefed and is now ripe for review.

## II. STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. <u>Id.</u> at 255.

## III.  DISCUSSION

Before turning to the substance of the parties' arguments, the court summarizes the Fourth Circuit opinion as relevant to the instant motion.  Defendants argued in their first motion for summary judgment that the Estate's claims are barred by the statute of limitations.[1]  See ECF No. 62 at 14.  In their second motion for summary judgment, defendants raised five additional grounds for summary judgment.  In its summary judgment order, this court found that the motions could be resolved on the statute-of-limitations ground alone; therefore, it did not consider the other five grounds raised.  ECF No. 208 at 21 n.4.  The court analyzed when the three-year statute of limitations period in S.C. Code Ann. § 15-3-535 accrued, i.e., when the Estate knew or should have known that a cause of action for legal malpractice could be brought.  Id. at 16.  After considering the evidence, the court determined that an email written by Wendy to Farace's assistant on February 8, 2012 triggered the limitations period because it was evidence that she suspected defendants' "divided loyalties" and should have known the Estate had a claim against them as of that date.  Id. at 20–21.

The Fourth Circuit reversed, concluding that the February 2012 email from Wendy "did not contain material relating to the substance of the present malpractice claim, which is based on the attorney's alleged failure in 2009 to advise Mr. Wellin fully of potential tax liabilities in implementing an estate-planning strategy."  ECF No. 219 at 3.  Namely, the Fourth Circuit found that the February 2012 email raised concerns solely related to the claim that Farace had a conflict of interest regarding the disposition of

---

[1] In accordance with the Fourth Circuit's ruling, the court formally denies defendants' first motion for summary judgment.

Keith's personal property. The conflict-of-interest claim, according to the Fourth Circuit, was not of the same nature as the Estate's claim that defendants engaged in misconduct by failing to advise Keith of the potential tax liability created by the 2009 Transaction. Id. at 15. The Fourth Circuit then determined that there were disputed issues of material fact regarding whether the alleged malpractice related to the 2009 Transaction was discoverable by Keith prior to mid-2013, when Keith terminated his attorney-client relationship with Farace and hired a new attorney. The Fourth Circuit remanded the case for further proceedings on the other grounds advanced by defendants in their motions for summary judgment.

Defendants maintain that summary judgment is still warranted in their favor based on the five grounds raised in their second motion for summary judgment. ECF No. 238 at 1. Those five additional grounds were fully briefed prior to entry of the court's summary judgment order. Defendants also argue that summary judgment is warranted based on later revelations made during the Estate's appellate arguments. See id. After the Fourth Circuit issued its opinion, defendants filed their supplemental motion, contending that by making certain arguments and concessions to the Fourth Circuit while the case was on appeal, the Estate no longer possesses standing and can no longer establish the damages element of its negligence claim.

Since defendants' supplemental arguments touch on jurisdictional issues, the court addresses those arguments first. The court first finds that the Estate must necessarily allege that defendants misled Keith about the 2009 Transaction by failing to disclose the tax consequences that would have resulted if the Berkshire Stock were sold prior to Keith's death. After filtering the Estate's claims, the court finds that the issue of

7

whether the Estate possesses standing turns on whether Keith would have signed off on the 2009 Transaction were it not for Farace's alleged failure to disclose those tax consequences. The court then finds that a genuine dispute of material fact exists as to whether Keith would have entered the 2009 Transaction if the tax consequences had been disclosed to him. As such, the court concludes that the Estate has standing and has sufficiently established the elements of negligence for purposes of this motion.

### A. Supplemental Arguments

The Estate does not dispute that it made certain concessions throughout the lifetime of this case to reflect the changing nature of litigation. See ECF No. 230 at 4 (explaining that the Estate withdrew certain allegations made in the amended complaint because "[a] lot has happened," including attorney turnover). But the Estate contends that any concessions it made during the litigation have no bearing on the issues of standing or damages. First, the Estate withdrew its claims related to the 2003 Transaction and admitted that Keith accepted and understood that transaction. See ECF No. 219 at 7 n.2; Wellin v. Wellin (ECF No. 46 at 6). Second, during oral arguments before the Fourth Circuit, the Estate withdrew "claims related to the Wellin children, including Farace's alleged conflict of interest in representing both the Estate and one or more of the Wellin children, and the defendants' acts of allegedly aiding and abetting two of the children in breaching their fiduciary duties." ECF No. 219 at 7 n.2; see also ECF No. 229 at 3 (acknowledging that the Estate had withdrawn its fourth cause of action for aiding and abetting a breach of fiduciary duty). The Estate avers that it never asserted a cause of action for "conflict of interest." ECF No. 229 at 5. Regardless, the parties agree

that the Estate's claims now center around whether Farace was negligent in the way he proposed the 2009 Transaction.  See ECF No. 219 at 7 n.3.

Defendants argue that on appeal, the Estate shifted its focus to Farace's alleged failure to disclose to Keith that he risked facing significant income tax liability from the 2009 Transaction if the Wellin Children liquidated the assets in Friendship Partners during Keith's lifetime.  They contend that by shifting its focus to the tax consequences, the Estate limited itself to recovering damages based on any adverse tax consequences it suffered as a result of the 2009 Transaction.  Defendants then argue that adverse tax damages never came to pass.  In support, defendants cite testimony from the Estate's estate planning expert, Jerome Hesch ("Hesch").  Hesch testified at his deposition that Keith disclosed the 2009 Transaction on his gift tax return that same year.  ECF No. 238-3, Hesch Dep. at 114:5–7.  Hesch further testified that the IRS audited the gift tax return and ultimately "did not challenge this transaction as a gift."  Id. at 159:24–160:9. Coupled with the fact that the statute of limitations for the IRS to challenge the tax return has run, defendants argue that "the IRS has not and cannot impose any income tax liability on the Estate related to the 2009 Sale."  ECF No. 238 at 8.  The upshot, according to defendants, is that because the undisclosed tax risks never came to fruition, the Estate cannot allege either (1) a cognizable injury, as required to possess standing to sue,[2] or (2) damages, as required for a negligence cause of action.

_____

[2] "[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  Under the first element, a plaintiff must demonstrate an "injury-in-fact," which is a "concrete and particularized . . . invasion of a legally protected interest."  Id.  Second, "there must be a causal connection between the injury and the conduct complained of, meaning that the injury must be "fairly . . . trace[able] to the challenged action of the defendant."  Id.  Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

In its response, the Estate argues that whether the IRS ultimately assessed any taxes is irrelevant to the injury or damages analyses.  According to the Estate, Keith suffered an injury from the mere act of parting with his partnership units in Friendship Partners in 2009 in exchange for a promissory note with a fixed value, save for a nominal interest rate.  The value of Keith's limited partnership units appreciated after he transferred them in 2009, as supported by valuations conducted by the Estate's valuation experts.  See, e.g., ECF No. 158-14, Crow Report at 15 (noting that the market value of the Estate's Berkshire Stock would have had a valuation of $266.9 million at the established future valuation date).  In other words, the Estate contends that but for Farace's negligence, the Estate would have retained[3] the Friendship Partners limited partnership units, and the injury it suffered can be quantified by the difference in the value between the promissory note and the appreciated value of the partnership interests.

In their reply, defendants first argue that the Estate is advancing a different theory than the one they presented to the Fourth Circuit, which focused exclusively on the claim that Farace failed to disclose the tax consequences of the 2009 Transaction.  According to defendants, the Estate made a calculated decision to focus on tax consequences to ensure that the February 2012 email could not serve as the basis for defendants' argument that the statute of limitations had accrued.  The Estate's tax-implication claim supposedly

---

decision." Id.  "On a motion for summary judgment, the plaintiff bears the burden to adduce evidence that, taken as true and drawing all reasonable inferences in the plaintiff's favor, satisfy each of the three Article III standing elements."  Courtland Co., Inc. v. Union Carbide Corp., 2022 WL 2392871, at *3 (S.D. W. Va. July 1, 2022) (citing Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 253 (4th Cir. 2020)).

[3] The Estate does not argue that it would necessarily still own the partnership units today.  But it proposes several different valuations based on different assumptions for if or when Friendship Partners were to have been dissolved.  ECF No. 155 at 29–30.

sidesteps the statute-of-limitations issue because the tax consequences are, uniquely, "the only aspect of the transaction . . . . not readily apparent from the face of the documents." ECF No. 240 at 4. Defendants argue that once the Fourth Circuit ruled that a material dispute existed as to whether Farace provided Wendy with adequate notice to discover the scope of the tax implications, the Estate changed its theory of the case "back to its original, much broader argument that Defendants' breach was proposing the 2009 Sale at all." Id. Defendants add that even if the Estate were permitted to return to this original theory, it would run into the same statute of limitations issue again—namely, that the fundamental elements of the 2009 Transaction were plainly apparent to Keith at the time of the transaction's execution.

The court agrees with defendants that the Estate is limited to arguing that defendants were negligent for failing to advise Keith about the potential tax liabilities of the 2009 Transaction. As the Fourth Circuit noted, counsel for the Estate represented to the Fourth Circuit panel at oral argument that "the tax consequences [of the 2009 transaction] are the fundamental claim." ECF No. 219 at 7 n.3 (alteration in original). Furthermore, the Fourth Circuit opinion itself establishes that the Fourth Circuit ruled with the understanding that the Estate's claim was premised on the alleged failure to disclose tax consequences. See, e.g., id. at 3 ("[The February 2012 email] did not contain material relating to the substance of the present malpractice claim, which is based on the attorney's alleged failure in 2009 to advise Mr. Wellin fully of potential tax liabilities in implementing an estate-planning strategy."); id. at 7 ("The particular claim at issue here is the Estate's allegation that the defendants failed to inform Mr. Wellin about the risks

and consequences of the 2009 transaction, including Mr. Wellin's potentially substantial tax exposure.").

The Estate insists it is relevant that Farace negligently proposed the 2009 Transaction and failed to inform Keith about other aspects of the transaction. For example, in its response to defendants' supplemental motion for summary judgment, the Estate reproduces from its appellant's brief a list of other alleged misrepresentations made by Farace. ECF No. 239 at 7–8. In addition to alleging that the transaction was fundamentally unnecessary to accomplish Keith's estate-planning goals, the Estate alleges, inter alia, that: (2) Farace "structured the 2009 Irrevocable Trust so that Mr. Wellin could not turn off grantor trust status on his own," (3) "failed to make simple amendments to the limited partnership operating agreements to prevent the sale of the Berkshire Hathaway stock," and (7) "failed to include provisions to ameliorate the consequences of these undisclosed risks." Id. Although these arguments were presented to the Fourth Circuit, it is apparent that the Fourth Circuit did not consider them after the Estate represented that the tax consequences were the "fundamental claim."[4] ECF No. 219 at 7 n.3. "A party can be held to concessions and admissions its counsel made at oral argument." Nesbitt v. Candler Cnty., 945 F.3d 1355, 1357 (11th Cir. 2020). As such, the court considers those broader arguments about the 2009 Transaction to be abandoned.

---

[4] To the extent the Estate argues that the failure to inform Keith about the capital-gains tax liability is part and parcel with the other errors allegedly committed by Farace, the court disagrees. Even if Keith (or later, Wendy) understood the other fundamental elements of the 2009 Transaction, he was not necessarily expected to understand the tax consequences. In other words, it is plausible that while Keith sold his partnership shares with an understanding of what the 2009 Transaction generally entailed, he would not have sold them had he been aware of the tax implications.

Moreover, even if the court were to consider the other alleged errors or misrepresentations made by Farace, the court finds that the fundamental aspects of the 2009 Transaction were either approved by Keith or should have been reasonably discovered by him.  Notably, the Estate insists that Farace should have never proposed the 2009 Transaction in the first place because no reasonably competent estate planner would "transfer[] away [Keith's] Friendship Partners limited partnership units for a promissory note with static value."  ECF No. 239 at 6.  But Keith signed off and signaled that he understood that facet of the 2009 Transaction.  Under South Carolina law, "a party who signed a contract is deemed to have read and understood 'the effect' of the contract."  York v. Dodgeland of Columbia, Inc., 749 S.E.2d 139, 146 (S.C. Ct. App. 2013).  Here, Keith signed several documents reflecting the fundamental nature of the 2009 Transaction.  These documents include:

- the Irrevocable Trust Agreement, ECF No. 65-13;

- a letter to Ceth, in her capacity as manager of Friendship Management, LLC providing notice of the proposed transfer, ECF No. 62-16;

- a notice of assignment of limited partnership interest, ECF No. 62-18; and

- checks signed and sent by Keith to fund the Irrevocable Trust and pay for an appraisal of the limited partnership units, ECF No. 144-8.

The Estate responds that Farace did not communicate with Keith about the 2009 Transaction prior to its implementation in October and November 2009.  Additionally, the Estate contends that the transaction documents do not disclose "the purpose, risks, and consequences of the 2009 Transaction," ECF No. 155 at 22, and Farace acted negligently because he "did not walk Keith through the numerous documents, did not ask

13

Keith if he had any questions, and did not ensure Keith understood the full implications of the 2009 Transaction," ECF No. 155 at 14–15.  The Estate's argument certainly has merit as it relates to the tax consequences—there is a reasonable dispute as to whether any of the transaction documents revealed the tax consequences of the transaction.  See ECF No. 158-12, Feb. 28, 2018 H'rg at 122:10–18.  But as it relates to the fundamental workings of the 2009 Transaction, the court concludes that the documents plainly revealed that the transaction entailed selling the partnership units to an intentionally defective grantor trust through which the Wellin Children, as the general partners, had the ability to sell the limited partnership's Berkshire Stock.

Even if Keith could not be considered to have understood the transaction at the time of signing, he should have reasonably discovered those aspects of the sale in the years following the Transaction.  After the assignment, Farace sent multiple letters to Keith stating that the 2009 Transaction resulted in the sale of Keith's limited partnership units to the Irrevocable Trust in exchange for a promissory note with a fixed value.  ECF Nos. 62-23, 62-24, 62-25.  Thus, Keith was reasonably on notice of the terms of the 2009 Transaction, and if he found that the fundamental purpose of the transaction was unpalatable, he had the ability to question Farace about the transaction and ultimately bring claims against him if he desired.  Keith did not do so.  However, the same cannot be said for the tax consequences.  There is no evidence in the record that Farace directly informed Keith about the potential tax liability, plus interest, that would have resulted from the liquidation of the partnership units while Keith was still alive.  As such—both as a result of the Fourth Circuit's ruling and based on the court's findings above—the Estate

is limited to arguing that defendants acted negligently by failing to disclose the <u>tax consequences</u> of the 2009 Transaction.

Defendants suggest that if the court reaches that very conclusion about the Estate's claim, the Estate cannot assert that it suffered an injury because no tax consequences came to pass. The court disagrees, finding that the Estate can still prove that it suffered a legally-cognizable injury. This conclusion is supported by the Fourth Circuit's ruling, as the Fourth Circuit ultimately did not address the issue of standing despite its awareness of the issue. The following exchange occurred during oral argument before the Fourth Circuit, where the issue of standing was raised:

> JUDGE AGEE: Counsel, if I could -- I have two questions. One goes to the questions that Judge Keenan raised. If the tax consequences that were feared by Mr. Farace never came to pass as a matter of fact, the implication of the earlier questions was: does the Estate have an injury? So, that was not a basis upon which the district court ruled. Are you contending as the threshold matter that the Estate now doesn't have standing because they don't have an injury?
>
> MR. STEPP: In essence, yes. We didn't frame it as standing, your honor, but it's certainly our position that the risk of these tax consequences -- the mere fact that the risk existed -- was not itself injury. A legal malpractice claim under South Carolina law requires that the conduct beneath the standard of care that proximately causes the risk --
>
> JUDGE AGEE: If you're correct that there's no injury, that goes directly to our subject matter jurisdiction, which -- the court on appeal can reach subject matter jurisdiction just as the trial court, but this was never addressed, as I understand it, to the trial court.
>
> MR. STEPP: That's correct, your honor. That is correct. We have always understood the plaintiff's contention as set out in the complaint, although they talk about tax consequences. But as the court has acknowledged, they never came to pass and they're really not in play at all.

Oral Argument at 17:14–18:58, <u>Wellin ex rel. Est. of Wellin v. Farace</u>, 2021 WL 5445968 (Sept. 22, 2021) (No. 20-1120), https://www.ca4.uscourts.gov/OAarchive/mp3/

20-1120-20210922.mp3.  The Fourth Circuit then pivoted to a separate line of questioning.

Contrary to defendants' suggestion, ECF No. 228 at 6, the Fourth Circuit did not conclude that subject matter jurisdiction was lacking.  Despite observing that "[t]he Estate did not pay any tax on the Wellin children's sale of the stock shares, and any attempt to collect such a tax by the IRS appears now to be barred by the statute of limitations," ECF No. 219 at 8 n.4, the circuit court ultimately did not address standing in its order.  Indeed, had the Fourth Circuit found that standing was lacking, it would have directly raised and decided the issue <u>sua</u> <u>sponte</u>, even though the issue was not raised before this court.  <u>See</u> <u>Benham v. City of Charlotte</u>, 635 F.3d 129, 134 (4th Cir. 2011) (citing <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 480 (4th Cir. 2005)) ("When a question of standing is apparent, but was not raised or addressed in the lower court, it is our responsibility to raise and decide the issue sua sponte."); <u>Dan River, Inc. v. Unitex Ltd.</u>, 624 F.2d 1216, 1223 (4th Cir. 1980) ("[W]hether raised or not, jurisdictional standing is an issue to be considered sua sponte by the court . . . .").

Even upon scrutinizing defendants' argument, the court concludes that the Estate possesses an avenue for proving that it has standing.  Although the tax liability never came to pass, the Estate argues that Keith would not have entered into the 2009 Transaction were it not for Farace's decision to withhold information about the tax consequences.  If that is true, the loss of value from accepting the promissory note in exchange for the partnership units represents a concrete and particularized injury, and

there would be a causal connection between the injury and the challenged conduct.[5]  <u>Cf.</u> <u>DiCocco v. Garland</u>, 52 F.4th 588, 592 (4th Cir. 2022) (holding that the plaintiff had standing to sue based on the allegation that without the defendant's discriminatory policy in place, she would not have resigned from her position, which resulted in a loss of employment and loss of wages and other benefits).  Conversely, if defendants can show that the tax implications had no effect on Keith's decision to enter into the 2009 Transaction, the Estate would apparently possess no other grounds for proving an injury or a causal connection.  Therefore, the issue is whether sufficient evidence exists to show that had Farace communicated the tax consequences of the 2009 Transaction, Keith would not have entered the transaction.  The court analyzes that issue in the following section.

### B.  Effect of the Failure to Disclose Tax Implications

The parties raise two broad categories of arguments concerning whether Farace's failure to disclose tax consequences contributed to Keith's decision to enter into the 2009 transaction.  First, the Estate claims that Keith himself testified to as much in related

---

[5] Defendants argue that the mere exposure to a risk is not an injury and does not result in damages.  They argue by analogy that there have been no reported cases in which a patient successfully sued a doctor for failing to disclose potential side effects for a treatment that did not ultimately result in said side effects.  But defendants' analogy is flawed.  To begin, defendants fail to consider that some states recognize a cause of action for medical battery based on a lack of informed consent.  <u>See</u> <u>Washburn v. Klara</u>, 561 S.E.2d 682, 686 (Va. 2002) (finding that a battery claim could be predicated on the allegation that the defendant exceeded the scope of the plaintiff's consent); <u>but see</u> <u>Linog v. Yampolsky</u>, 656 S.E.2d 355, 358 (S.C. 2008) (holding that South Carolina does not recognize an independent cause of action for medical battery and that claims stemming from a lack of or revocation of consent must be brought under a claim for medical malpractice).  Additionally, defendants' analogy fails to mirror the scenario presented here, where the Estate alleges that Farace's alleged failure to disclose information deemed critical by Keith did in fact lead to unforeseen consequences (in the form of lost assets).

proceedings.  Second, defendants argue that the risk of potential tax liability preexisted

the 2009 Transaction.  The court considers each issue in turn.

### 1.  Keith's Testimony

The Estate asserts that Keith "twice testified under oath that he was not informed

of the 2009 Transaction's tax implications and would not have executed the documents

had he known of those consequences."  ECF No. 155 at 16; see also ECF No. 239 at 4

("But for Farace's failure to convey to Mr. Wellin the potential tax consequences of the

2009 Transaction, Mr. Wellin would not have entered into that transaction.").  The Estate

refers to excerpts from Keith's affidavit and his deposition in Wellin v. Wellin.  ECF No.

155 at 16 (citing ECF No. 158-10, Wellin v. Wellin Keith Aff. and ECF No. 158-7,

Wellin v. Wellin Keith Dep. at 20:18–21:22).

Keith stated in his affidavit:[6]

> 23.      When I eventually received written information about this
> transaction from Mr. Farace's firm, the information I received indicated that
> I could pay income taxes on behalf of the trust but did not indicate that I
> would be required to pay all such taxes.

> 24.      Peter Wellin did not inform me that, absent massive tax
> costs, I would not be able to get out from under this potential tax exposure.

> 25.      Peter Wellin did not inform me that the transaction was not
> advantageous from a tax perspective for me during my lifetime.

> *      *      *

> 34.      I agreed to this transaction because my children, whom I
> trusted, represented to me that it was in my best interest.

Wellin v. Wellin Keith Aff. ¶¶ 23–25, 34.  The following exchange occurred during

Keith's deposition:

---

[6] The Estate did not provide a pincite in their citation to the affidavit, and the
court assumes that these are the statements that the Estate refers to.

Q.      In effect, Mr. Wellin, did you understand that in making this transaction, you were transferring to your three children the stock or money the stock was worth and taking a tax liability upon yourself by retaining no upside possibility other than minimal interest?

MR. BRUNSON:      Objection, leading.

THE WITNESS:      No, I didn't understand that at all.

BY MR. ROBERT HOOD:

Q.      You did not understand that at all.  Was any of this told to you by Peter or Ceth?

Mr. BRUNSON:      Objection, leading.

BY MR. ROBERT HOOD:

Q.      The tax liability.

A.      No.

Q.      If you had been aware of the tax consequences and other implications of the 2009 transaction, would you have consented to it?

MR. BRUNSON:      Objection, leading.

THE WITNESS:      I would not.

Wellin v. Wellin Keith Dep. at 20:18–21:14.

Keith's statements in both his affidavit and at the deposition were produced in separate but related proceedings.  Evidence from prior litigation "is hearsay, and would therefore ordinarily be as inadmissible in support of a summary judgment motion as it would be at trial."  Stanley Martin Cos., Inc. v. Universal Forest Prods. Shoffner LLC, 396 F. Supp. 2d 606, 613 (D. Md. 2005) (citing Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251–52 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment[.]")).  By the same token, evidence "submitted in connection with a motion for summary judgment may contain hearsay statements that would be admissible at the trial under exceptions [or

exclusions] to the hearsay rule." Wyant v. Burlington N. Santa Fe R.R., 210 F. Supp. 2d

1263, 1275–76 (N.D. Ala. 2002) (citing H. Sand & Co. v. Airtemp Corp., 934 F.2d 450,

454–55 (2d Cir. 1991)).  Defendants argue that Keith's affidavit and deposition from

Wellin v. Wellin are inadmissible hearsay, and thus "[n]either of these statements is

admissible in this case."  ECF No. 240 at 8.  Although the parties previously brushed

upon the issue of the statements' admissibility, the court requested supplemental briefs

from the parties to further aid in the court's understanding of their arguments.

 The Estate primarily argues that Keith's former testimony is admissible under

Federal Rule of Evidence 804(b)(1).  That rule provides that testimony is excluded by the

rule against hearsay if the declarant is unavailable as a witness and the testimony

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

> (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross[], or redirect examination.

Fed. R. Evid. 804(b)(1).  As a preliminary matter, Rule 804(b)(1) does not apply to

Keith's affidavit.  See N.L.R.B. v. McClure Assocs., Inc., 556 F.2d 725, 726 (4th Cir.

1977) (per curiam) (finding that the administrative law judge did not err in excluding an

affidavit for failure to comply with Rule 804(b)(1) because, among other issues, "there

was no opportunity for cross-examination").[7]  Therefore, the issue is whether Keith's

deposition testimony falls under this exception to the rule against hearsay.

---

[7] In any event, it is not apparent from the affidavit whether Keith would have consented to the 2009 Transaction had he been informed of the tax consequences.  He states in the affidavit that he agreed to the transaction because his children, via Farace, informed Keith that it was in his best interest.  Wellin v. Wellin Keith Aff. ¶ 34.  Unlike his deposition testimony, Keith never directly affirms that knowledge of the tax consequences would have altered his decision.

There is no dispute that Keith is an unavailable witness.  See Fed. R. Evid. 804(a)(4) (explaining that a declarant is unavailable if he cannot testify at the trial because of death).  There is also no dispute that the first prong of Rule 804(b)(1) is met: the testimony was given by Keith as a witness at a lawful deposition.  Under the second prong of Rule 804(b)(1), the Estate argues that the testimony is now being offered against defendants, whose predecessor in interest had the opportunity to cross examine Keith.  According to the Estate, the Wellin Children were predecessors in interest in the prior case.

When reviewing the admissibility of evidence under Rule 804(b)(1), courts focus "on the similarity of motives between the predecessor in interest and the one against whom the deposition is now offered."  Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 282 (4th Cir. 1993).  "In a situation in which the motives differ, the testimony may not be introduced."  Id.  To prove "similar motives of witness examination," it is not enough for the party offering the evidence to simply show that the party against whom the deposition is offered and his predecessor in interest shared a similar motive in challenging the action.  Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc., 2020 WL 1809191, at *7 (D. Md. Apr. 9, 2020) (emphasis added and internal quotation marks omitted).  At the same time, the party against whom the deposition is offered must point to "distinctions in her case not evident in the earlier litigation that would preclude similar motives of witness examination."  Horne, 4 F.3d at 283.

The court concludes that the Wellin Children are predecessors in interest to defendants in this case and had a similar motive in developing Keith's testimony through cross examination.  As the Estate argues, the Wellin Children were similarly interested in

eliciting testimony from Keith that he fully understood the 2009 Transaction.  In
response, defendants argue that the Wellin Children had different motivations in cross
examining Keith.  Specifically, defendants argue that there were conflicting motives
because the Wellin Children were incentivized to treat Farace as "a scapegoat [] whom
they could point the finger [at] to potentially absolve them of liability."  ECF No. 257 at
14.  But defendants fail to point to any line of questioning in the deposition that remotely
suggests the Wellin Children were pursuing a "scapegoat" theory.  Rather, the Wellin
Children underscored in their summary judgment briefs in Wellin v. Wellin that "both
Peter and Farace believed that Keith understood the transaction."  Wellin v. Wellin (ECF
No. 931 at 20).  Elsewhere in their briefs, the Wellin Children described Farace's efforts
regarding the 2009 Transaction as a "consultation with Keith" and stated that Farace
thoroughly "explained the pros and cons of the transaction" to both the Wellin Children
and Keith.  ECF No. 931 at 7–8.  If anything, the Wellin Children pursued a theory that
Farace acted appropriately.

   Defendants also argue that counsel for the Wellin Children clearly had different
motivations because they never followed up on disparaging comments that Keith made
about Farace.  For example, when Keith testified in his deposition that he thought Farace
was "a lousy lawyer" and "should be disbarred," counsel for the Wellin Children did not
choose to ask any follow-up questions or otherwise seek an explanation for the answer.
ECF No. 257-2, Wellin v. Wellin Keith Dep. at 50:16–51:5.  Defendants suggest that a
true predecessor in interest would have sought to rehabilitate Farace.  However,
defendants ignore that just prior to Keith's answer, counsel for the Wellin Children had
asked Keith if he understood that Farace was employed "with a very large New York law

firm, Nixon Peabody," prompting Keith to respond that he thought poorly of Farace despite the pedigree of the law firm at which he was employed. Id. at 50:13–23. Once Keith made his position clear, there was no reason for counsel to pursue that line of questioning. Again, there are multiple indications that the Wellin Children thought Farace to be trustworthy and no indication that counsel for the Wellin Children had wanted Keith to answer to the contrary.

Finally, defendants argue that there are distinctions in this case that were not evident in the earlier litigation and would preclude similar motives of witness examination. In support, defendants cite a district court case from the Western District of Virginia in which several school boards sued two dairy companies for conspiring to raise the price of milk supplied to the school boards and for fraudulently concealing the conspiracy. State of W. Va. ex rel. McGraw v. Meadow Gold Dairies, Inc., 875 F. Supp. 340, 343 (W.D. Va. 1994). When the school boards sought to introduce testimony from a former manager of one of the dairies given in a prior criminal trial for conspiracy, the court precluded the use of testimony. The district court agreed with the dairy-company defendants that the criminal defendants had only been motivated to develop the manager's testimony regarding the conspiracy, and there had been no motive to develop testimony about fraudulent concealment. Id. at 346. Accordingly, the district court ruled that the defendants in the criminal case were not predecessors in interest to the defendants in McGraw. Id. at 347. Defendants argue that based on McGraw, the Wellin Children did not possess the same motive because their counsel was focused on asking questions that would allow them to defend against Keith's breach of fiduciary claims—not claims of negligence against Farace.

Defendants' reliance on McGraw is misplaced.  In a related case, the Fourth Circuit explicitly rejected the argument raised in McGraw and adopted by the district court.  See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 127 (4th Cir. 1995).  In Supermarket of Marlinton, a chain of retail food stores brought an antitrust action against several dairy companies, alleging that the dairies conspired to fix milk prices.  Id. at 121.  The supermarkets sought to introduce the same manager's testimony from the previous criminal trial.  Id. at 126.  The same district court again determined that the criminal defendants' sole motive for questioning the manager was "to show that the conspiracy never happened," but the dairies were motivated to show that "any acts of secrecy were committed in furtherance of, rather than separate and apart from, the conspiracy."  Id.  This time, the Fourth Circuit reversed, finding that under Rule 804(b)(1), "the party against whom the testimony was admitted in the prior proceeding need only have had a 'similar motive,' not an 'identical motive,' to the party in the second proceeding."  Id. at 127 (quoting United States v. Salerno, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring)).  The Fourth Circuit went on to find that the criminal defendants' motivation in questioning the manager was substantially similar to the dairy companies' motivation because "the dominant motive in each trial is to show the conspiracy never occurred."  Id.

Not only is Supermarket of Marlinton the controlling authority, but the court finds that the Fourth Circuit's reasoning is more germane to this case.  Here, the gravamen of the Wellin Children's argument as it related to the 2009 Transaction was that Peter and the other Wellin Children did not breach their fiduciary duties by recommending the transaction to Keith because Keith knew what it entailed.  Farace had unquestionably

24

"explained the pros and cons of the transaction to the Wellin Children," and Peter "assisted with communications between Farace and Keith about the 2009 transaction." Wellin v. Wellin (ECF No. 931 at 8). Thus, there was no escaping the fact that the Wellin Children knew about the nature of the 2009 Transaction and discussed it with Keith. As such, the Wellin Children were similarly motivated to claim that "Keith had a pretty good grasp of what this modification was going to entail." Id. (internal quotation marks and citation omitted); see also id. at 20 ("[B]oth Peter and Farace believed that Keith understood the transaction."). Defendants argue that the Wellin Children could have done more to ask Keith about how much he understood the 2009 Transaction, and they point to a list of questions that the Wellin Children should have asked. ECF No. 257 at 11. But again, the parties' motivations need not be identical, and the court finds that the Wellin Children ultimately shared a similar incentive to elicit Keith's understanding of the 2009 Transaction.[8]

With admissibility decided, the court turns to the substance of the deposition testimony and finds that the testimony largely speaks for itself. Keith plainly testified that he would not have consented to the 2009 Transaction had he been aware of the tax consequences. Wellin v. Wellin Keith Dep. at 21:10–14. Thus, the court finds that Keith's deposition testimony aids the Estate in establishing a genuine dispute of material fact as to whether Keith would have agreed to the 2009 Transaction but for Farace's failure to communicate the tax risks. Nevertheless, if defendants are correct that Keith

_____

[8] In the alternative, the Estate argues that Keith's statements in Wellin v. Wellin should be admitted under the residual or catch-all exception in Rule 807. Since the court finds that the deposition meets the exception under Rule 804(b)(1), it need not determine whether the evidence is otherwise admissible under Rule 807.

already knew about the tax implications following the 2003 Transaction, summary judgment may still be warranted in defendants' favor. The court therefore turns to that issue next, ultimately finding that there is a genuine dispute of material fact as to whether Keith understood the tax consequences dating back to 2003.

### 2. Preexisting Tax Implications from the 2003 Transaction

In support of their position that Farace's supposed failure to disclose the tax consequences did not play a role in Keith's decision to enter the 2009 Transaction, defendants argue that the risk of tax liability resulting from a sale of the partnership units already existed following the 2003 Transaction, and since the Estate acknowledged that Keith understood the 2003 Transaction, the tax liability could not have served to dissuade Keith from entering the 2009 Transaction. Defendants argue that if anything, the 2009 Transaction "placed Keith in a <u>better</u> position as it relates to potential tax liability" vis-à-vis the 2003 Transaction. ECF No. 238 at 11 (emphasis in original).

To properly address this issue, the court must first determine if the Estate should be precluded from arguing that Keith did not understand the tax implications of the 2003 Transaction. There is little dispute that Keith would have faced significant income-tax exposure if the Wellin Children chose to liquidate the Friendship Partners' assets during Keith's lifetime. Defendants argue that although the Estate framed this tax liability as a risk that resulted from the 2009 Transaction, the same risk already existed in 2003 because the Wellin Children had the authority to sell the Berkshire Stock following the 2003 Transaction. ECF No. 238 at 10 (citing ECF No. 62-7 at 13). The Estate does not meaningfully dispute that the 2003 Transaction resulted in the Wellin Children gaining that authority. Instead, the Estate argues that by conceding claims related to the 2003

26

Transaction, the Estate was not admitting that Keith knew he would be liable for capital gains taxes upon the sale of the Berkshire Stock and "that Mr. Wellin understood this aspect of the 2003 transaction." ECF No. 229 at 7; see also ECF No. 239 at 11 ("[T]here is nothing in the record showing that Mr. Wellin understood the income-tax implications of either transaction.").

Defendants take great umbrage with the Estate's argument, which they claim is entirely inconsistent with the Estate's prior representations to this court and the Fourth Circuit. According to defendants, since the Estate previously stated that Keith fully understood the 2003 Transaction, the Estate should be judicially estopped from arguing that Keith did not understand the tax implications of the 2003 Transaction. Defendants' position is well taken. The Estate stated on numerous occasions that it was no longer pursuing any claims related to the 2003 Transaction. For example, in Wellin v. Wellin, Keith wrote that he "understood the 2003 transactions through which he transferred his BRKa stock in exchange for a limited partnership interest" and "[t]he harm to [Keith] did not come until the November 2009 Transaction." Wellin v. Wellin (ECF No. 46 at 6). Then, in the instant action, the following exchange occurred at the hearing on defendants' first motion for summary judgment:

> MR. HUMPHRIES: Great. In response to one of the last things that Ms. Cundari said and one of the first things, I thought we'd made it pretty clear in our briefing that the main focus of our claim is the 2009 transaction.

> THE COURT: 2003 transaction is off the table?

> MR. HUMPHRIES: It's off the table. It's evidence of breach, I think, but the focus is 2009 transaction, which I thought it was pretty clear in our brief, and to the extent --

> THE COURT: It's clear now.

27

> MR. HUMPHRIES: Yeah.  To the extent it wasn't, we've served expert reports, and if Your Honor would like them, we can provide those to you, which we come up with measures of the damages based on what the fair market value of the units would be today.  If -- you know, there's two other measures which is appropriate under the <u>Moore v. Moore</u> in terms of measuring damages.  That aside, put that point hopefully to rest.

ECF No. 86 at 104:22–105:12.  The Estate therefore conceded that there was no actionable advice provided by Farace regarding the 2003 Estate.

Even so, the court considers judicial estoppel to be an extreme remedy in this instance.  "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation." <u>John S. Clark Co. v. Faggert & Frieden, P.C.</u>, 65 F.3d 26, 28–29 (4th Cir. 1995).  "[T]he doctrine is invoked to prevent a party from 'playing fast and loose with the courts,' from 'blowing hot and cold as the occasion demands,' or from attempting 'to mislead the [courts] to gain unfair advantage.'" <u>King v. Herbert J. Thomas Mem'l Hosp.</u>, 159 F.3d 192, 196 (4th Cir. 1998) (quoting <u>Lowery v. Stovall</u>, 92 F.3d 219, 223, 225 (4th Cir. 1996)) (alteration in original).  However, "courts must apply the doctrine with caution." <u>John S. Clark Co.</u>, 65 F.3d at 29.  In order for judicial estoppel to apply,

> (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally misled the court to gain unfair advantage.

<u>Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.</u>, 867 F.3d 449, 458 (4th Cir. 2017), <u>cert. denied sub nom.</u> <u>Applied Underwriters Captive Risk Assurance Co. v. Minnieland Private Day Sch., Inc.</u>, 138 S. Ct. 926 (2018).  The Fourth Circuit has "characterized the final element as 'determinative.'" <u>Id.</u>

Here, the Estate's position about Keith's understanding of the tax implications following the 2003 Transaction is somewhat at odds, if not altogether inconsistent, with its prior position about Keith's understanding of the 2003 Transaction as a whole. The issue with applying the doctrine, however, is that it is unclear—from a technical perspective—what the Estate conceded in both Wellin v. Wellin and in this case. Certainly, the Estate agreed that it would no longer pursue any claims related to the 2003 Transaction. But in doing so, it merely explained that Keith "understood the 2003 transactions through which he transferred his BRKa stock in exchange for a limited partnership interest." Wellin v. Wellin (ECF No. 46 at 6). The Estate did not specifically state that Keith understood he was opening himself up to the potential of incurring capital gains taxes. As it relates to the Fourth Circuit's four-factor test, the court finds that factors three and four have not been met.

Under the third factor, judicial acceptance means that the court "has adopted the position urged by the party[, either as a preliminary matter or] as part of a final disposition." Lowery, 92 F.3d at 224–25 (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 n.5 (6th Cir. 1982)). "The insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances." Id. Here, this court's summary judgment order focused on Farace's alleged conflict of interest, which the court determined was tied to the Estate's claims about Farace's allegedly improper advice. Thus, in ruling on the motion for summary judgment, the court did not necessarily accept the Estate's representation about the 2003 Transaction.

Under the fourth factor, the court finds that the Estate did not intentionally mislead the court about Keith's knowledge of the tax consequences. Certainly, it is plausible that the Estate changed its position on the 2003 Transaction to avoid triggering the statute of limitations based on discussions that Keith had with Farace about the 2003 Transaction. After all, there is no dispute that Keith fully understood he had transferred his Berkshire Stock to Friendship Partners in exchange for a partnership interest. But that same reasoning fails to explain why the Estate would have agreed to concede that Keith understood the potential tax risks of the transaction (if indeed it did). The Estate has always maintained that Farace never mentioned the tax implications to Keith—either following the 2003 Transaction or the 2009 Transaction. See ECF No. 239 at 11–12. In other words, assuming the Estate had not withdrawn its claims about the 2003 Transaction and those claims were therefore dismissed on statute-of-limitations grounds, the Estate's allegation about the failure to disclose tax consequences in 2003 would likely still have survived because, as defendants acknowledge, that failure was "not readily apparent from the face of the documents." ECF No. 240 at 4. Since the Estate was not obliged to admit that Keith understood the tax implications of the 2003 Transaction after relinquishing its cause of action for the same, there would be no reason for the Estate to mislead the court about its tax-implications claim. Accordingly, the court finds that this is not among the narrowest of circumstances in which judicial estoppel ought to apply.

Finally, even if the court were to determine that the Estate should be judicially estopped from arguing that Keith did not understand the tax consequences of the 2003 Transaction, the Estate has raised a genuine dispute of material fact about whether there were tax implications that were unique to the 2009 Transaction such that it could still

30

raise the tax-consequences argument.  Specifically, the Estate notes that Keith still owned a 98.9% interest in Friendship Partners following the 2003 Transaction.  It contends that as a result, the Wellin Children had no financial incentive to sell the shares, and there was virtually no likelihood that the Wellin Children would have done so—resulting in capital gains taxes—following the 2003 Transaction.  The Estate concludes that once Keith sold his interest in Friendship Partners to the intentionally defective grantor trust, the risk of tax liability from a sale of the shares manifested at that time.  To be sure, the court expresses some doubt with this argument; after all, the tax risk following the 2009 Transaction was similarly a hypothetical one as well.  Ultimately though, the court finds that there is scant reason for concluding that Keith understood the tax implications of the transactions beyond the artificial reason that the Estate withdrew its claim relating to the 2003 Transaction.

Therefore, the court proceeds to consider the Estate's core argument that Keith failed to understand the tax consequences of both the 2003 Transaction and 2009 Transaction.  Upon review, the court finds that a genuine dispute of material fact exists as to whether Keith understood the tax implications that would result from the sale of the underlying Berkshire Stock for both transactions.  Namely, the Estate points to the fact that in letters sent on November 7, 2006, Farace advised Keith of the risks involved with the Strangi method and of other financial risks, such as if Keith were to become medically incapacitated; however, Farace never mentions the risk that Keith would have to pay capital gains taxes on the sale of the Berkshire Stock owned by Friendship Partners.  See ECF Nos. 157-10, 157-12.  In one letter, Farace asked to meet with Keith, ECF No. 157-10 at 4, but there is no evidence that the meeting ever occurred.  The Estate

also submits that there was no documented communication between Keith and Farace from when Farace sent the November 2006 letters to when Keith signed the 2009 Transaction documents. ECF No. 65-5, Farace Dep. at 279:18–280:21.

Having found that a genuine dispute of material fact exists as to whether Keith knew of and understood the tax consequences, the court returns to the standing inquiry. "On a motion for summary judgment, the plaintiff bears the burden to adduce evidence that, taken as true and drawing all reasonable inferences in the plaintiff's favor, satisfy each of the three Article III standing elements." Courtland, 2022 WL 2392871, at *3 (citation omitted). The court finds that the Estate has met its burden of showing it suffered an injury due to the sale of Keith's partnership interest. Based on the record evidence, there are genuinely disputed issues of material fact regarding whether Keith was unaware of the tax implications of the 2003 or 2009 transactions due to Farace's alleged lapse in responsibility. As such, the question of whether Keith would have entered those transactions but for Farace's alleged failure to inform Keith of the tax consequences remains one for the jury to decide.

Additionally, the court finds that based on the evidence that Farace failed to disclose the tax consequences, there are genuinely disputed issues of material fact regarding the remaining issues raised in defendants' second motion for summary judgment,[9] including whether the Estate has sufficiently set forth damages for its

---

[9] These are: (1) whether there is competent evidence that Keith understood and agreed to the 2009 Transaction, (2) whether there is substantial, uncontroverted evidence that Keith understood and agreed to the 2009 Transaction, (3) whether knowledge may be imputed from the documents that Keith signed as part of the 2009 Transaction, and (4) whether Keith ratified the 2009 Transaction or otherwise waived his right to assert claims about it.

negligence cause of action.  Accordingly, the court denies defendants' second motion for summary judgment.  However, the Estate will be limited to arguing that defendants breached their duty <u>by failing to disclose the tax consequences of the 2009 Transaction</u>; any arguments about Farace's alleged negligence in generally proposing the transaction are not properly before the court for the reasons set forth before, <u>supra</u> III.A.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion for summary judgment as set forth in the order.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**December 19, 2022**
**Charleston, South Carolina**